(C. D. 1940)

MCGLYNN HAYS INDUSTRIES, INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided December 5, 1957)

*Barnes, Richardson & Colburn* (*Eugene F. Blauvelt* and *E. Thomas Honey* of counsel) for the plaintiff.

*George Cochran Doub*, Assistant Attorney General (*Samuel D. Spector*, trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: Merchandise, described in the record as "two thread illuminators, complete with mirrors, lens, chokes and special discharge lamps," was classified by the collector of customs as articles in chief value of metal, not specially provided for, and duty was imposed thereon at the rate of 22½ per centum ad valorem, as provided in paragraph 397 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 397), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802.

In its protest, as originally filed, plaintiff claims that the importation should be classified as textile machinery and parts in paragraph 372 of said act (19 U. S. C. § 1001, par. 372) and dutiable at the rate of

10 per centum ad valorem. By amendment thereof, the protest now claims that the merchandise is properly classifiable as articles having as an essential feature an electrical element or device in paragraph 353 of said act (19 U. S. C. § 1001, par. 353), as modified by the Torquay protocol to the general agreement, 86 Treas. Dec. 121, T. D. 52739, and dutiable at 13¾ per centum ad valorem, or, alternatively, as articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy, pursuant to the provisions of said paragraph 353, as modified by the General Agreement on Tariffs and Trade, *supra*, for which duty at the rate of 15 per centum ad valorem is provided.

At the trial, the original claim invoking paragraph 372 was not pressed and, inasmuch as no argument in support of that claim is made in plaintiff's brief, it is deemed as having been abandoned.

The pertinent text of the statutes relied upon is here set forth.

Paragraph 397, as modified, *supra*—

Articles or wares not specially provided for, whether partly or wholly manufactured:

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

 Composed wholly or in chief value of iron, steel, lead, copper, brass, nickel, pewter, zinc, aluminum, or other metal (not including platinum, gold, or silver), but not plated with platinum, gold, or silver, or colored with gold lacquer:

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

  Other (except slide fasteners and parts thereof)____ 22½% ad val

Paragraph 353, as modified by the Torquay protocol, *supra*—

Articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens ranges, washing machines, refrigerators, and signs, finished or unfinished, wholly or in chief value of metal, and not specially provided for:

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

 Other (except the following: blowers; combination candy cutting and wrapping machines; cooking stoves and ranges; cordage machines; fans; flashlights; industrial cigarette making machines; internal-combustion engines of the non-carburetor type; machines for determining the strength of materials or articles in tension, compression, torsion, or shear; machines for packaging pipe tobacco; machines for wrapping candy; machines for wrapping cigarette packages; tobacco cutting machines; and washing machines)_____ 13¾% ad val

Paragraph 353, as modified by the general agreement, *supra*—

Articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy, and articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs; all the foregoing (not including electrical wiring apparatus, instruments, and devices)

finished or unfinished, wholly or in chief value of metal, and not specially provided for:

\*          \*          \*          \*          \*          \*          \*

Other articles (except machines for determining the strength of materials or articles in tension, compression, torsion, or shear; flashlights; batteries; vacuum cleaners; and internal-combustion engines)_____ 15% ad val.

Frank P. Pendleton, the only witness in the case, was called by plaintiff. Pendleton testified that he is presently associated with the American Balmes Corp., as vice president, but that, from May 1, 1947, to May 1, 1955, he had been vice president of the plaintiff company which dealt in textile machinery and equipment.

The witness testified to his familiarity with the subject merchandise, having authorized the purchase of the material and having participated in the installation of the equipment in textile mills.

Pendleton produced a sample of the importation, which was received in evidence as plaintiff's collective exhibit 1 and which he described as follows:

It comprises a lamp housing, containing a high pressure mercury vapor lamp in the central portion to operate with and in conjunction with the choke and a reflector mirror is also used in the same installation. The equipment is used on a spinning textile—textile spinning machine that makes yarn. It is mounted on the frame to throw an intense and concentrated beam of light laterally down the length of the frame where there are being spun perhaps up to 200 threads simultaneously and the light beam intersecting those threads makes it possible for those operators to see the threads which is quite fine from a distance where normally the operator, if they are running a dark shade of thread, the operator cannot see it standing right in front of it. The unit is mounted and directly supported on the spinning frame.

In order to properly operate a high-pressure mercury vapor lamp what is known as a choke, also described as a reactor choke, is required. In describing the function of the choke, the witness stated:

The whole unit in composite of which I have a diagram is connected with a 220 volt or 260 volt power supply. The choke is an integral part of the unit since if you plug the mercury vapor lamp into a 220 volt line, it will immediately blow out. It is by virtue of this reactance within this choke that—that choke specifically as it sounds, it acts as a carburetor does on an automobile or as a valve would on a water supply, but it is automatic in its operation. It modifies the initial very high surge of current that would occur to the lamp without that unit in the circuit.

\*          \*          \*          \*          \*          \*          \*

The choke works to limit the surge of current that without the choke would be like a short circuit in the lamp itself [and] would blow the lamp out immediately. There would be no resistance to the flow of that current. The choke comprises a wound coil of electrical wire with an iron core and a laminated frame surrounding the coil and connected to the core. It is essentially the construction of a transformer. \* \* \*

The purpose of the lens was described by Pendleton as follows:

* * * The lens, there is some curvature to it so it can be called a lens, but the concentration of light is primarily developed from the mercury vapor lamp itself. It is an unusual construction. There is no lamp made in this country that we have been able to find that has such a close arc; such a short dimension between the electrodes and the light from that arc lamp, the concentrated light, it is funneled through the orifice and the light then, the light from the source contacts just a flat mirror in here which turns it.

With respect to the mirror, the witness stated:

That mirror is merely to change the direction of the light beam so that when mounted on the spinning frame, it will go in the right direction to intersect the threads and the lens referred to which you asked about is here, as I say, in certain instances, this is a clear glass. This one happens to have some curvature to it, so it might be called a lens, but the concentration of light is primarily not dependent upon the lens but upon the closeness of the source, the closeness of the electrodes of the tube itself.

In use, the lamp housing is mounted on one end of the spinning frame so that the two beam centers will shine the length of the frame from opposite sides of the frame. Since the spinning frame is a two-sided machine, a single lamp tube lights up the threads on both sides of the machine. A mirror, of which there is normally a minimum of two, "is mounted at the opposite end of the frame which may be up to 50 or 60 feet away to return the beam on itself, you might say; it is merely adjusted to catch the light rays * * * and bounce them back * * *."

Although the lamp housing is installed or mounted on brackets at one end of the frame, the choke is ordinarily placed directly below the lamp housing on the floor under the spinning frame.

The items comprising collective exhibit 1 are bought and used as a unit.

Without proceeding further with the electrical features of the device, suffice it to say that the ultimate purpose of the illuminator is to cast a small pinpoint of light through a half inch orifice. The beam of light is thrown on to the mirror, which is at the end of the lamp, and is then thrown through the lens on to the spinning machine, the light beams being in line with the threads that are to be shown. In this way, the thread illuminator performs the function of several operators who otherwise watch the various fibers on the knitting machine.

In this connection, it is interesting to note the claim of the patentee, Carl Otto Meiners, which is disclosed in the letters patent 2,625,785, exhibit 2, as follows:

I claim:

1. Lighting means for providing shadow-free and glare-free illumination of threads in spinning, twining, and similar textile machines, comprising a frame for the machine, said frame having side walls and a cross-member secured at its ends to said side-walls, mounting means secured on said cross-member near one

extremity thereof, a light source comprising a lamp and a long focus objective carried by said mounting means near one side wall and arranged to direct a narrow beam of rays of light transversely to a row of threads in the plane thereof, and a mirror mounted on the other side wall and arranged in the path of the beam of rays to reflect it.

2. Lighting means for providing shadow-free and glare-free illumination of threads in spinning, twining, and similar textile machines, comprising a frame for the machine, said frame having side walls and a cross-member secured at its ends to said side walls, a pipe secured to said cross-member near one extremity thereof, clamping means releasably mounted on said pipe, a tubular housing held in said clamping means and arranged near and parallel to one side wall, a lamp and a long focus objective carried in said tubular housing and arranged to direct a narrow beam of rays of light transversely to a row of threads in the plane thereof, a mirror mounted on the other side wall in the path of the beam of rays of light to reflect said beam, and an anti-glare shield with dulled surface for said mirror.

While both parties litigant contend that the importation should be classified as an entirety, defendant insists that the collector correctly classified it as an article in chief value of metal in paragraph 397, as modified, *supra*.

Plaintiff, on the other hand, contends that the commodity should be classified in the provision of paragraph 353, as modified, *supra*, which enumerates "Articles having as an essential feature an electrical element or device." In support of that contention, plaintiff invokes the doctrine announced in *United States* v. *Dryden Rubber Co.*, 22 C. C. P. A. (Customs) 51, T. D. 47050. In determining the application of said paragraph 353, we quote from said opinion as follows:

There are two inquiries, therefore, when the question of the classifiability of an article under this division of the paragraph is under consideration: First, is it essentially an electrical article? The electrical feature must be an essential feature, without which the article will not function, normally, for the purposes intended, for, it must be manifest, that if it be not an electrical article, it does not come within the division at all. Second, if it is such an electrical article, is it an article named in the language, or within the class of articles named in this paragraph?

In view of the conclusion we have reached herein, we find it unnecessary to determine whether or not the subject merchandise answers the call of paragraph 353. For reasons set forth, *infra*, the thread illuminators in controversy are excluded from classification in said paragraph 353, regardless of their electrical equipment.

Defendant has invited our attention to various judicial authorities and to the legislative history of paragraphs 353 and 397 which dictate the course of our decision herein.

In *United States* v. *N. Minami & Co., Inc.*, 29 C. C. P. A. (Customs) 169, C. A. D. 188, the merchandise under consideration by the court consisted of Christmas wreaths made of wood chip and having an electrical cord with a metal socket attached, used generally at Christ-

mas time for decorative purposes in homes where they were hung in windows and electrically lighted at night. They were held to be properly dutiable as "articles having as an essential feature an electrical element or device, such as * * * signs" in said paragraph 353. However, in its treatment of the case, the court took occasion to examine at some length the legislative history of paragraph 353, from which it was clear that it was not the intention of Congress, in framing the provisions of paragraph 353, to include therein illuminating or lighting fixtures, lamps, lamp bases, candelabra, or candle sticks.

In a later case, our appellate court, in *National Carloading Corp.* v. *United States,* 44 C. C. P. A. (Customs) 77, C. A. D. 640, which dealt with the dutiable classification of certain electric-light sockets, again reviewed the legislative history of paragraph 353.

The reasoning of the court in those cases clearly indicates that Congress intended to relegate illuminating articles, regardless of their electrical equipment, to the basket provision of the metal schedule, paragraph 397.

Upon the facts of record herein, the thread illuminators are obviously illuminating articles. They possess light-generating power activated by an electrical current and are used solely to throw "an intense and concentrated beam of light laterally down the length of the frame where there are being spun perhaps up to 200 threads simultaneously and the light beam intersecting those threads makes it possible for those operators to see the threads which is quite fine from a distance where normally the operator * * * cannot see it standing right in front of it."

Based upon the record before us and for the foregoing reasons, we find and hold that the thread illuminators in controversy were properly classified as articles in chief value of metal, not specially provided for, in paragraph 397 of the Tariff Act of 1930, as modified, *supra,* and are dutiable at 22½ per centum ad valorem. The protest is, therefore, overruled in all respects.

Judgment will be entered accordingly.